UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEUTSCHE BANK TRUST COMPANY AMERICAS, as Trustee,<br><br>                    Plaintiff,<br><br>          -against-<br><br>ELLIOTT INTERNATIONAL, L.P., et al.,<br><br>                    Defendants. | ECF CASE<br><br>Civ. No. 09-cv-5242 |
| ELLIOTT INTERNATIONAL, L.P., LIVERPOOL LIMITED PARTNERSHIP, STRUCTURED PRINCIPAL STRATEGIES, LLC, WELLS FARGO BANK, N.A. AND ZAIS INVESTMENT GRADE LIMITED II,<br><br>                    Cross-Claim Plaintiffs,<br><br>          -against-<br><br>DOES 201 through 300,<br><br>                    Cross-Claim Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT THAT REPRESENTATIONS AND WARRANTIES
WERE BREACHED CAUSING AN EVENT OF DEFAULT, AND THAT
<u>NO EFFECTIVE WAIVER OF SUCH EVENT OF DEFAULT WAS GIVEN</u>**

# **TABLE OF CONTENTS**

**Page**

Table of Authorities .................................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 2

    A.   The Structure of the Transaction .................................................................................. 2

    B.   The Role of the Portfolio Manager .............................................................................. 3

    C.   The Restrictions on the Assets That May be Purchased .............................................. 3

    D.   The Event of Default .................................................................................................... 5

    E.   There Was No Valid Waiver of the Event of Default .................................................. 7

ARGUMENT ............................................................................................................................... 9

    A.   The Summary Judgment Standard ............................................................................... 9

    B.   Improper Loans Were Purchased by Aladdin, Causing an Event of Default ............ 10

    C.   There Was No Valid Waiver of the Event of Default ................................................ 11

CONCLUSION .......................................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................12

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................................12

*First National Bank of Arizona v. Cities Service Co.*,
    391 U.S. 253 (1968)..................................................................................................12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..................................................................................................12

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 56..................................................................................12

Defendants/Cross-Claim Plaintiffs Elliott International, L.P. ("Elliott"), Liverpool Limited Partnership ("Liverpool"), Structured Principal Strategies, LLC ("Structured Principal") and Wells Fargo Bank, N.A. ("Wells Fargo," and collectively with Elliott, Liverpool and Structured Principal, the "Interpleader Claimants"), hereby submit their Memorandum in Support of their Motion for Summary Judgment that Representations and Warranties Were Breached, Causing an Event of Default, and That No Effective Waiver of Such Event of Default was Given, and state as follows:

## INTRODUCTION

Summary judgment is appropriate here because Aladdin, the party responsible for selecting and purchasing loans for the transaction at issue, has repeatedly admitted that a number of loans it purchased were improper under the controlling Indenture. Not surprisingly, that constitutes a breach of the representation and warranty that only loans that comply with the Indenture will be purchased. The Indenture states that such a breach of a representation and warranty constitutes an Event of Default (as defined in the Indenture) if it continues for thirty days after notice of the breach is given. It is uncontested that the Interpleader Claimants gave notice of this breach in June of 2009, and that a number of the improper assets complained of remain in the transaction. Therefore, there is no genuine dispute that an Event of Default has occurred.

Summary judgment is also warranted on the only defense raised by Aladdin, *i.e.*, that a prior Noteholder waived all Events of Default arising from the purchase, sale and continued holding of improper assets. Although such a waiver must be in writing, none of Aladdin, the Indenture Trustee, or the prior Noteholder produced anything resembling, let alone constituting such a waiver, in response to document requests specifically targeting the alleged waiver. Even more dispositive are interrogatory responses from the Trustee, which maintains the Note Register

reflecting the amount of Notes owned by every Noteholder. The Trustee's responses show that the prior Noteholder at issue did not own a majority of Class A Notes, and only Noteholders having such a majority may waive an Event of Default under the Indenture. The former Noteholder itself confirmed the Trustee's responses in a response to a subpoena.

As a result, it is clear that an Event of Default has occurred under the Indenture and that this Event of Default was not validly waived. The Court should grant summary judgment and allow the Interpleader Claimants to pursue their remedies under the Indenture.

## FACTUAL BACKGROUND

A.  The Structure of the Transaction

The transaction at issue is a Collateral Debt Obligation, which is a financial structure that makes payments to noteholders based upon securities or loans that are purchased to create an income stream. In this case, there were four classes of notes: Class A Notes, Class B Notes, Class C Notes and Class D Notes. Class A Notes are the most senior and Class D Notes are the most junior Notes, and the respective rights of the holders or owners of the Notes are governed by the Indenture among Landmark II CDO Ltd., Landmark II CDO, Inc. and Deutsche Bank Trust Company Americas, dated as of September 18, 2002 ("Indenture"). (Indenture, Exhibit A to the Affirmation of Brendan E. Zahner dated November 15, 2010 ("Zahner Aff.") at p. 78, section 2.7; p. 160, section 11.1(a)(i))  The transaction also included Preferred Shares, and payments on the Preferred Shares are subordinated to payments to the four Classes of Noteholders. (*Id.*)

Under the Indenture, as long as any Class A Notes are outstanding the Class A Notes are defined as the Controlling Class. (Exhibit A at p. 24)  In turn, the Controlling Party is defined to mean the Holders of a Majority of the Notes of the Controlling Class, with Majority meaning more than 50% of the Aggregate Outstanding Amount of the Notes of such Class. (Exhibit A at

p. 35)  The Controlling Party has substantial rights under the Indenture, and relevant here, among those rights is the ability to waive past Events of Default.  (Exhibit A at p. 106, section 5.14)  No other party is given the right to waive Events of Default under the Indenture.

The Interpleader Claimants currently hold a Majority of the Aggregate Outstanding Amount of the Notes of the Controlling Class, and are therefore considered the Controlling Party under the Indenture.  (Trustee's Response to Interrogatory No. 1, Exhibit B to the Zahner Aff.)  The Interpleader Claimants also hold at least 66⅔% of the Aggregate Outstanding Amount of the Controlling Class, which entitles them to direct the sale and liquidation of all or a portion of the Assets if there is an Event of Default.  (*Id.*; Exhibit A at p. 102, section 5.5(a)(ii))  The Interpleader Claimants allege that loans with ineligible maturity dates were purchased (the "Long-Dated Assets"), causing an Event of Default.

  B. The Role of the Portfolio Manager

Aladdin Asset Management LLC ("Aladdin") is the Portfolio Manager under the Management Agreement dated as of September 18, 2002 between Landmark II CDO Ltd. and Aladdin (the "Management Agreement").  As Portfolio Manager, Aladdin agreed to perform certain duties with respect to the collateral (*i.e.*, the securities or loans) securing the Notes, consistent with the terms of the Management Agreement and the Indenture.  (Management Agreement, Exhibit C to the Zahner Aff. at p. 3, section 2)  These duties included buying and selling Collateral Debt Obligations subject to the terms and restrictions of the Indenture.  (*Id.*)  Under the Management Agreement, Aladdin is responsible for selecting all Collateral Debt Obligations to be acquired.  (*Id*. at p. 4 section 2(c))

  C. The Restrictions on the Assets That May be Purchased

The Indenture's definition of Collateral Debt Obligation specifically describes the securities, loans or obligations that are eligible to be purchased by the Portfolio Manager.

(Exhibit A at pp. 17-23)  The definition of an instrument that is eligible to be a Collateral Debt Obligation includes the requirement that any such obligation "mature on or prior to the Stated Maturity . . .," with the limited exception that no more than 2.5% of the overall portfolio may have a "a maturity date later than the Stated Maturity" if certain ratings tests were met.  (*Id*. at clause (f)(3)(ii))

> The Indenture defines Stated Maturity as:
>
> With respect to any Collateral Debt Obligation, the maturity date specified in such security or applicable Collateral Instrument; with respect to any Class A Note, Class B Note, Class C Note and Class D Note, the Payment Date in September 2012; provided, that, if any such date is not a Business Day, such Stated Maturity shall be the next following Business Day.

The definition of Collateral Debt Obligation referred to above could only have used the term "Stated Maturity" to mean the Payment Date in September 2012 (the second component of the definition), or else the restriction would mean that a loan must mature on or before its own maturity date, which would be circular and meaningless.  This is also highlighted by the exception allowing no more than 2.5% of the portfolio to be obligations with maturity dates beyond the Stated Maturity.  There is no possibility of a loan having a maturity date later than its own maturity date, meaning there would be no need for this exception unless the Indenture meant Stated Maturity in the sense of the Payment Date in September 2012.  Moreover, as detailed below, Aladdin has admitted that loans with improper maturity dates were purchased.

The Indenture includes a representation and warranty by the Issuer that the Collateral Debt Obligations included in the transaction satisfy the requirements of the definition of Collateral Debt Obligations under the Indenture.  This representation and warranty is made both as of the Closing Date and as of the date of acquisition with respect to any Assets acquired after the Closing Date.  (Exhibit A at p. 92, section 3.3(h)(xix))

D.   The Event of Default

While the Interpleader Claimants allege that there were multiple Events of Default, this motion concerns the Event of Default that arose from the breach of the warranty and representation described above. Specifically, it is an Event of Default "if any representation or warranty of the Co-Issuers made in this Indenture or in any certificate or writing delivered pursuant hereto proves to be incorrect when made," if such breach or default continues for 30 days after notice is given. (*Id*. at p. 96, Section 5.1(e)) Unlike other provisions of the Indenture, there is no requirement under this provision that the incorrect representation or warranty must have a material adverse effect on Noteholders:

> (e) a default in the performance, or breach, of any other covenant, warranty or other agreement of the Co-Issuers in this Indenture which has a material adverse effect on the Holders of the Notes (other than the covenant to meet any Asset Quality Test or any Coverage Test, which breaches will result, among other things, in the consequences described under the Priority of Payments) **or if any representation or warranty of the Co-Issuers made in this Indenture or in any certificate or writing delivered pursuant hereto proves to be incorrect when made, and the continuation of such default or breach for a period of 30 days after written notice thereof shall have been given**, by registered or certified mail or overnight courier, to the Co- Issuers and the Portfolio Manager by the Trustee or to the Co-Issuers, the Portfolio Manager and the Trustee by the Holders of at least 25% of the Aggregate Outstanding Amount of the Notes of the Controlling Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder . . .

(*Id*. at p. 96, Section 5.1(e) (emphasis added))

Aladdin's own admissions make clear that a number of assets it purchased do not satisfy the requirements of the definition of Collateral Debt Obligations under the Indenture, because, among other things, their maturity exceeds the Stated Maturity. Indeed, Aladdin has admitted this several times in writing, stating:

> Aladdin Capital Management bought, sold and held certain loans that do not qualify as Collateral Debt Obligations (assets permissible to be acquired under the Indenture ("CDOs")). The volume of these assets was in excess of the 2.5% basket allowed for the transaction.

- 5 -

(November 3, 2009 Memorandum by Marc Schuman of Aladdin to Stephen Mandella, which was copied to Amin Aladin, Neal Neilinger, Harumi Aoto, Scott Harrington, Bill Fish, Lisa Hurley, Patrick Maloney, John D'Angelo and Bill Griffin, Exhibit D to the Zahner Aff.)

> In a nutshell there was a technical violation of the Indenture - assets were purchased which exceeded the maturity of the CLO.

(August 7, 2009 email from John J. D'Angelo of Aladdin to Omar Zaghis, Stephen Mandella, Lorenzo Rodriguez and William Fish of Aladdin, Exhibit E to the Zahner Aff.)

> Over a period of time [Aladdin] purchased various loans for the Landmark II CLO which had a stated maturity that was longer than the stated maturity allowed for eligible assets.

(Annex to August 7, 2009 email from Marc Schuman of Aladdin to John J. D'Angelo, William Griffin and William Fish of Aladdin, Exhibit F to the Zahner Aff.)

These admissions make clear that Aladdin purchased assets that matured later than allowed under the Indenture and therefore did not qualify as Collateral Debt Obligations. In addition, Moody's Investors Service, an independent third party, found that that Landmark II transaction contained a significant amount of "securities with maturities past the legal maturity of the transaction." (August 15, 2008 notice by Moody's Investors Service, Exhibit G to the Zahner Aff.)

Contrary to the representation and warranty in section 3.3(h)(xix) of the Indenture, all assets included in the transaction did not satisfy the requirements of the definition of Collateral Debt Obligations under the Indenture. This representation and warranty was therefore incorrect when it was made with respect to the Long-Dated Assets (*i.e.*, the date on which they were acquired), and this is a Default under section 5.1(e) of the Indenture.

On June 4, 2009, Elliott, Liverpool, Structured Principal, SEI Managed High Yield, SEI Institutional High Yield, SEI Structured Credit and ZAIS Investment Grade Limited II delivered a Notice of Default to the Trustee ("Notice of Default," Exhibit H to the Zahner Aff.). The

- 6 -

Notice of Default reiterated the details of a prior notice of default, and indicated that the representation and warranty in section 3.3(h)(xix) of the Indenture had been breached, and that this was a Default under section 5.1(e).

More than 30 days have passed since the Notice of Default was given and the Default has not been cured, making the breach of the representation and warranty an Event of Default under the terms of the Indenture.  (Exhibit A at p. 96, section 5.1(e))

  E.  <u>There Was No Valid Waiver of the Event of Default</u>

In its counterclaim Aladdin raised the allegation that its breaches of the Indenture were waived by a prior Class A Noteholder, without providing specific information or support for that claim.  (Aladdin's Counterclaim, docket entry 48 at ¶¶ 5, 9)  Discovery has shown that the prior Class A Noteholder that supposedly provided a waiver to Aladdin was Goldman Sachs Asset Management ("GSAM").  (August 20, 2009 email from Nina Chen of GSAM to Jason Archer and Vincent Pham, copying David Kim, Logan Lowe and David Rosenblum, Exhibit J to the Zahner Aff.)

Notably, however, none of Aladdin, GSAM or the Trustee have produced a copy of this claimed waiver in response to the document requests from the Interpleader Claimants.  The Indenture states that to be sufficient, any waiver by a Noteholder must be in writing:

> Any request, demand, authorization, direction, notice, consent, **waiver** or Act of Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:
>
> (a) the Trustee by any Noteholder or by the Issuer or the Co-Issuer **shall be sufficient for every purpose hereunder if in writing** and made, given, furnished or filed to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form, to the Trustee addressed to it at its Corporate Trust Office, telecopy No. (714) 247-6293, Attention: Landmark II CDO Administration, or at any other address previously furnished in writing to the Co-Issuers or Noteholders by the Trustee (any notice, direction, request or other communication from the Portfolio Manager to the Trustee under Article 12 (other than certifications required

thereunder) may be by electronic mail, which shall be deemed to constitute a writing);

(Exhibit A at p. 175, section 14.3) (emphasis added)  Moreover, a waiver only becomes effective when the instrument in which it is embodied is delivered:

> Any request, demand, authorization, direction, notice, consent, **waiver** or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, **such action shall become effective when such instrument or instruments are delivered to the Trustee**, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this Section 14.2.

(Exhibit A at p. 174, section 14.2(a)) (emphasis added)  No instrument containing a waiver was produced in response to document requests specifically seeking its production, and hence no valid waiver was given under section 14.3 of the Indenture and no waiver could have become effective under section 14.2 of the Indenture.  Moreover, as further evidence that no waiver was intended or granted, the Trustee never received any waiver and therefore never provided notice of any waiver to Noteholders, as is explicitly required by the second paragraph of section 5.14 of the Indenture.  (Trustee's Response to Interrogatory No. 5, Exhibit B to the Zahner Aff.; Exhibit A at p. 106, section 5.14)

More importantly, however, GSAM never owned a Majority of the Class A Notes, including at the time it was discussing the Long-Dated Assets with Aladdin and the Trustee. (Trustee's Response to Interrogatory No. 2, Exhibit B to the Zahner Aff.; GSAM Supplemental Document Response, Exhibit I to the Zahner Aff.)  In fact, as of August 21, 2008 GSAM only owned 46.81% of the Aggregate Outstanding Amount of Class A Notes.  (*Id*.)  According to the Trustee, which maintains or has access to the Note Register of all Notes owned, GSAM never

owned any different amount of Class A Notes, until it later sold its entire position.  (Exhibit A at p. 66, section 2.5(a), Trustee's Response to Interrogatory No. 3, Exhibit B to the Zahner Aff.)  Because GSAM owned less than 50% of the Aggregate Outstanding Amount of Class A Notes, it was not the Controlling Party and did not have the power to waive defaults under section 5.14 of the Indenture.

## ARGUMENT

A. The Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a party may move at any time for full or partial summary judgment, which should be granted if:

> The pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

Rule 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  While the initial burden of demonstrating the absence of a material factual dispute rests with the movant, once met the burden then shifts to the non-moving party to present "significant probative supporting evidence" that a factual dispute exists.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A factual dispute can only arise if the issue is both "genuine" and "material."  To show a "genuine" issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Similarly,  factual issues are only "material" if they "might affect the outcome of the suit under the governing law," *Anderson*, 477 U.S. at 248.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'." *Matsushita*, 475 U.S. at 587, *quoting First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253 (1968).

B. <u>Improper Loans Were Purchased by Aladdin, Causing an Event of Default</u>

Aladdin was responsible for selecting all Collateral Debt Obligations to be acquired for the transaction at issue. (Exhibit C at p. 4 section 2(c)) Aladdin was also responsible for actually buying and selling Collateral Debt Obligations, subject to the terms and restrictions of the Indenture. (*Id*. at p. 3, section 2) As a result, Aladdin's repeated admissions that it purchased loans that did not qualify as Collateral Debt Obligations, because of their improper maturity, is dispositive on the question of whether or not these assets qualified as Collateral Debt Obligations. These admissions leave no genuine disputed issue of fact on this question:

> Aladdin Capital Management bought, sold and held certain loans that do not qualify as Collateral Debt Obligations . . .

(Exhibit D)

> In a nutshell there was a technical violation of the Indenture - assets were purchased which exceeded the maturity of the CLO.

(Exhibit E)

> Over a period of time [Aladdin] purchased various loans for the Landmark II CLO which had a stated maturity that was longer than the stated maturity allowed for eligible assets.

(Exhibit F)

In turn, because there is no question that the improper maturity of the Long-Dated Assets disqualifies them from being Collateral Debt Obligations, it is clear that there was a breach of the representation and warranty that the assets "included in the transaction satisfy the requirements of the definition of Collateral Debt Obligations under the Indenture . . ." (Exhibit A at p. 92, section 3.3(h)(xix))

Under section 5.1(e) of the Indenture, this breach of the representation and warranty became an Event of Default when it continued for 30 days after notice was given. There is no dispute that notice of the breach was given on June 4, 2009 (Exhibit H) and that the breach

continued for more than 30 days after notice was given, making the breach an Event of Default under section 5.1 of the Indenture.

      C.      <u>There Was No Valid Waiver of the Event of Default</u>

Aladdin apparently claims that it was given a blanket waiver of all Events of Default that might arise from the purchase of the Long Dated Assets, but this argument fails as a matter of law for several reasons.

First, there is no written waiver, as evidenced by the failure of Aladdin, the Trustee and GSAM to produce such a waiver. Waivers are only considered sufficient under the Indenture if they are given in writing, and are considered effective only once the instrument embodying the waiver has been delivered. (Exhibit A at sections 14.2, 14.3) There is no evidence that a written waiver was given or that such a waiver was received, in which case the Event of Default was not waived. As further evidence that no waiver was given, the Trustee did not receive any waiver and therefore did not provide Noteholders with notice of any waiver, as is required under the second paragraph of section 5.14 of the Indenture. (Trustee's Response to Interrogatory No. 5, Exhibit B to the Zahner Aff.; Exhibit A at p. 106, section 5.14)

Moreover, the Trustee was the initial Trust Registrar under the Indenture, and therefore was responsible for maintaining the Note Register and tracking the ownership and transfer of the Notes. (Exhibit A at section 2.5(a)) At a minimum, even if another party were to have been subsequently appointed to be the Note Registrar, the Trustee has access to the Note Register "at all reasonable times" and the right to inspect the Note Register and obtain copies of it. (*Id.*) In its responses to interrogatories, the Trustee indicated that as of August 21, 2008, GSAM only owned approximately 46% of the Outstanding Aggregate Amount of the Class A Notes. As a result, GSAM was not the Controlling Party, and did not have the right or ability to waive any Events of Default under the Indenture.

As a result, not only have Aladdin, the Trustee and GSAM all failed to produce a written waiver as required under the Indenture, but GSAM did not have the authority to waive Events of Default under the Indenture. Consequently, the Event of Default was not waived and the Interpleader Claimants, and the current Controlling Party, have full legal right to pursue their remedies under the Indenture.

## CONCLUSION

For the foregoing reasons, the Interpleader Claimants request that the Court enter summary judgment that: i) the representation and warranty in section 3.3(h)(xix) was breached; ii) this breach has become an Event of Default because more than 30 days passed since notice of default was given; iii) this Event of Default was not waived under the Indenture; iv) the Controlling Party under the Indenture may pursue its Event of Default remedies under the Indenture; and v) Interpleader Claimants are entitled to such other and further relief as may be deemed just.

Dated: November 15, 2010
New York, New York

SNR DENTON US LLP

By: /s/ Brendan E. Zahner
Jonathan D. Forstot
Brendan E. Zahner

1221 Avenue of the Americas
New York, New York 10020-1089
Telephone: (212) 768-6700
Fax: (212) 768-6800
jonathan.forstot@snrdenton.com
brendan.zahner@snrdenton.com

*Counsel for Elliott International, L.P.,
Liverpool Limited Partnership,
Structured Principal Strategies, LLC and
Wells Fargo Bank, N.A.*